UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON

Eastern District of Kentucky
FILED
JAN 31 2003
AT LEXINGTON
LESLIE G. WHITMER
CLERK U.S. DISTRICT COURT

CRIMINAL ACTION NO. 01-93-KSF

UNITED STATES OF AMERICA                                    PLAINTIFF

V.                              ORDER

TAREQ SHALASH, et. al.                                      DEFENDANTS

* * * * * * * * * * * * * *

This matter is before the Court upon the criminal convictions of Tareq Shalash (AKA "Derrick") and Ziyad Shalash (AKA "Tony") pursuant to the forfeiture provisions of the money laundering statute, 18 U.S.C. § 982 and the RICO statute, 18 U.S.C. § 1963. The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1355, and the defendants have waived their right to have the jury retained for the forfeiture determination.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The government has the burden of proving the factual basis for this criminal forfeiture by a preponderance of the evidence. *Libretti v. United States*, 516 U.S. 29 (1995); *United States v. Corrado*, 227 F.3d 543 (6th Cir. 2000).

The government seeks a money judgment of $957,817.23, representing $242,390 paid by the Shalashes to thieves for procuring stolen property, and a cashier's check in the amount of $715,427.23 derived from a tainted bank account. In order to forfeit property under the money laundering statute, the Court must find that the property was either the actual money laundered,

1

was involved in the money laundering offense, or was property traceable to a money laundering offense. *United States v. Hill*, 167 F.3d 1055 (6th Cir. 1999).

In making the determination of the proper amounts subject to forfeiture, the Court is not bound to specific instances proven at trial and can order the forfeiture of any amount otherwise involved in the money laundering conspiracy. *See, e.g., United States v. Baker*, 227 F.3d 955 (7th Cir. 2000).

The deposits of proceeds from the sale of stolen property constitutes money laundering. The trial testimony established that the Shalashes led an organized network of purchasing and reselling stolen property for profit. A network of thieves transferred stolen property to the Shalashes and were paid by cash or check. Employees of Gillette and Proctor and Gamble testified at trial that the prices at which Unity and United were selling their products were far below the normal wholesale price.[1] Products stolen from many manufacturers were found in the Shalash warehouses on the day of the search. The government's expert witness, William Delahoyde, testified that the vast majority of product being handled by United Trading Company was obtained by fraud, theft or some form thereof. In addition, Delahoyde opined that more than half of the product Unity handled was obtained in the same manner.[2] Trial testimony established

---

[1] The Court finds the testimony of these witnesses to be more credible than that of the ex-Shalash employee Al Cornette in regard to the legitimate nature of the diversion industry. While the diversion industry may be legal, the overwhelming evidence at trial and at the forfeiture hearing demonstrates that defendant's businesses did not follow that route. In short, there is no "nexus" between the legitimate diversion industry and defendant's businesses. If the defendant's offered an accountant expert at trial or at the forfeiture hearing as they speculated they would, the Court may have been persuaded otherwise.

[2] The Shalashes attack the credibility and objectivity of Delahoyde, a former federal prosecutor now working in the private sector. The fact that the Fourth Circuit Court of Appeals reversed portions of a jury verdict obtained by Delahoyde in a case similar to the one at bar does

2

that deposits of the proceeds of stolen property were placed into the Shalashes' bank accounts. The government established at trial that the Shalashes paid $242,390 to various thieves in connection with stolen property, and the Court finds that this figure is far below the actual amount of money laundering proceeds derived from the conspiracy. Delahoyde provided credible evidence, under the preponderance standard, that the defendants were part of a nationwide "black market" fencing operation.[3]

Trial testimony further indicates that upon learning of the Indictment in this action, Ziyad Shalash wrote a check on United Trading Company's bank account made payable to his brother Anas Shalash. Anas Shalash then converted the check to a Community Trust Bank cashier's check in the amount of $715,427.23. Anas Shalash was the only family member and employee of the Shalash entities not under Indictment. The funds in the bank account on which the check was drawn were derived in whole or part from the sale of stolen property. The conversion of the funds to a cashiers check was in an effort to conceal or disguise the proceeds of the stolen property.

Accordingly, the Court orders judgment in the amount of $957,817.23 as the actual amount of the funds laundered by the Shalashes. In the alternative, this amount was clearly "involved in" the money laundering offense by facilitating the crime in an effort to hide or conceal the tainted funds. *See, e.g., United States v. McGauley*, 279 F.3d 62 (1st Cir. 2002). As

---

not minimize his knowledge of the illegal fencing activities upon which he now opines. Importantly, the defendants did not call any witnesses to rebut the testimony of Delahoyde.

[3] The fact that Delahoyde had not heard of the defendants before he left the government in 1997 is inconsequential because he left the government before the time-frame covered by the Indictment.

3

the evidence at the trial and forfeiture hearing indicates, as confirmed in the presentence report, the Shalashes commingled any legitimate funds with the tainted funds in an effort to disguise the nature and source of the scheme. *See Presentence report p.30 ("laundering of funds in an effort to mask the scale of the operation"); United States v. Tencer*, 107 F.3d 1120 (5th Cir 1997), *cert. den.* 522 U.S. 960 (1997);*United States v. Bornfield*, 145 F.3d 1123 (10th Cir. 1998).

### Bank Accounts of Unity Wholesale and United Trading

For the same reasons identified above, the Community Trust bank accounts of Unity and United shall be forfeited pursuant to a money laundering theory. The Unity Wholesale account contains $1,343,578.19 and the United Trading account contains $346,363.86 which shall be forfeited. These accounts served as an integral part of the RICO enterprise of buying and selling stolen property, and in the alternative shall be forfeited in their entirety as interests in the RICO enterprise, in light of the expansive construction given RICO's forfeiture provision *See, e.g, United States v. Walsh*, 700 F.2d 846, 857 (2d Cir. 1983); *United States v. Corrado*, 227 F.3d 543, 557 (6th Cir. 2000) (quoting *United States v. Faulkner*, 17 F.3d 745, 775 (5th Cir. 1994)); *United States v. Sarbello*, 985 F.2d 716 (3d Cir. 1993). These accounts undeniably afforded a source of influence over the enterprise because they were used by both Tareq and Ziyad to further the affairs of the enterprise. There is certainly a sufficient nexus between any legitimate money in the accounts and the illegal activities.

### Brookstreet and Paine Webber Accounts

As alleged in the Indictment and demonstrated at trial, the source of certain funds in these investment accounts was Unity Wholesale's checking account. Funds from the Unity checking account in the amount of $240,000 were transferred into the Paine Webber account of Tareq

4

Shalash on August 1, 2000; and $300,000 was deposited into the Unity Wholesale account from the same source on September 28, 2000. On October 12, 2000, $300,000.14 was transferred from Unity Wholesale's Paine Webber account into the Paine Webber account of Tareq Shalash. On November 16 and December 22, 2000, checks were drawn on the Unity checking account in the amounts of $300,000 and $240,000, respectively, and placed in the personal account of Tareq Shalash at Paine Webber. Tareq Shalash then transferred $50,000 of the funds in his personal Paine Webber account into an account that he set up and maintained control over in the name of Jamil Shalash. Finally, on October 12, 2001, the contents of the Paine Webber account in the name of Tareq Shalash were transferred to a Brookstreet Securities account and were eventually seized by the government.

The above timeline of transactions demonstrates the effort to move the funds further from the original tainted source to disguise the illegal proceeds. Moreover, forfeiture remains appropriate even though some of the funds involved may not be illegal proceeds. *See Tencer*, 107 F.3d 1120 (5th Cir. 1997). The accounts are clearly involved in the offense and whatever funds remain in these accounts shall be forfeited to the government.

### Real Property: 753 Pine Street and 500 Horton Court, Lexington, Kentucky

At trial, numerous witnesses described extensive illegal transfers of goods centering around these properties. Stolen products were found in these warehouses on the day of the government search. The warehouses facilitated the illegal activity by serving as the location to unload many trucks carrying stolen products. Further, the warehouses were used to clean and repackage the stolen product that was stored there until sold. The properties at both locations were acquired and/or maintained during the course of running the racketeering enterprise, and

5

afforded a source of influence over the illegal enterprises. Accordingly, there is a sufficient nexus between the property and the RICO violations, and the property shall be forfeited.

### Defendants' Interests in Unity and United

The portion of the defendants' businesses that operate legitimately provided a cover for the vast amounts of the illegal racketeering activity. The illegal activity of repackaging stolen products for resale is clearly related to and enabled by the defendants' ownership interests in these corporations. Accordingly, there is a sufficient nexus between the business interests and the RICO violations, and these interests shall be forfeited. *See, e.g., United States v. Corrado,* 227 F.3d 543 (6th Cir. 2000) *United States v. Locascio,* 6 F.3d 924 (2nd Cir. 1993).

### EXCESSIVENESS ARGUMENT

As an initial matter, in money laundering cases, the forfeiture of proceeds of money laundering should never be considered excessive. *See United States v. Loe,* 248 F.3d 449 (5th Cir. 2001). Regardless, even considering the total amount of the forfeiture under both statutes together, in order to be excessive the fine or forfeiture has to be "grossly disproportional to the gravity of the defendant's offense." *United States v. Bajakajian,* 524 U.S. 321 (1998). A comparison of the forfeiture to the fine for the offense is not determinative, but only a factor to be considered in the analysis.

Evidence in the record indicates that Unity made a profit of approximately $3 million per year in 1999 and 2000. Assuming the same for 2001, Unity profited $9 million during the years that are the subject time-frame of the indictment. The forfeiture amount totals approximately $4 million, less than half of the profits enjoyed by one of the companies. The defendants were convicted of serious crimes involving significant economic losses to manufacturers, and

6

ultimately to consumers. These crimes certainly involved a proactive "guilty mind" over an extended period of time and cannot be fairly analogized to the crime of omission at issue in *Bajakajian*. The forfeiture is not grossly disproportional to the gravity of the offenses.

Accordingly, the Court, being fully advised, HEREBY ORDERS

(1) defendants' request to stay forfeiture pending appeal is DENIED;

(2) the United States has proved by a preponderance of the evidence that the property sought for forfeiture, as described above, is forfeitable in its entirety;

(3) Amended Judgments will be entered contemporaneously herewith.

This ___31st___ day of January, 2003.

KARL S. FORESTER, CHIEF JUDGE

7